# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| CRYSTAL DUNTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 2:14cv0033 TCM |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Crystal Dunton (Plaintiff) for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the undersigned by written consent of the parties. See 28 U.S.C § 636(c).

## Procedural History

Plaintiff applied for SSI in September 2010, alleging she was disabled as of August 16, 2010, because of serotonergic syndrome,[1] fibromyalgia, migraines, depression,

---

[1] Serotonergic syndrome, or serotonin syndrome, occurs when two drugs affecting the body's level of serotonin are taken together, causing too much serotonin to be released or to remain in the brain area. Serotonin Syndrome, http://www.nlm.nih.gov/medlineplus/ency/article/007272.htm (last visited Jan. 7, 2015). Examples of when it can occur are when someone is taking migraine medicines and antidepressants. Id. With treatment, symptoms usually go away in less than twenty-four hours. Id.

osteoarthritis, pain, fatigue, and panic attacks. (R.[2] at 77-85, 135.) Her application was denied initially and after a July 2012 hearing before Administrative Law Judge (ALJ) Stephen M. Hanekamp. (Id. at 12-25, 32-38, 297-331.) After reviewing additional evidence, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 4-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Bob Hammond testified at the administrative hearing.

Plaintiff, thirty-five years old at the time of the hearing, testified that she is married, has two daughters, ages nine and twelve, and lives with them and her husband, who is disabled by migraines. (Id. at 302-03.) She "graduated tenth grade."[3] (Id. at 302.) She is 5 feet 7 inches tall and weighs 255 pounds. (Id. at 306-07.) She is right-handed. (Id. at 307.) She has had Medicaid since August 2010. (Id. at 303.)

Her past jobs include working as an editor and office manager for a local newspaper. (Id. at 304.) She quit this job after nine months when she found out she was pregnant and the pregnancy was high-risk. (Id.) She was fired from her job as a stock person at a Fast Stop store after "just a couple of months" when she left during her shift because her husband was in a car accident. (Id.) She worked at Casey's as a cashier and then an assistant manager.

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

[3]This is clearly an error. She disclosed in her Disability Report that she completed the twelfth grade. (See id. at 136.)

(Id. at 305.)  This job ended after she had a disagreement with another employer and the manager took that employee's word over hers.  (Id.)  She worked for four to five months as a cashier at a grocer's, but was fired when her daughters sold Girl Scout cookies at work.  (Id. at 305-06.)  And, she quit a job at Wal-Mart after four months because she could not afford the gas to drive back and forth.  (Id. at 306.)

Asked how her fibromyalgia affects her, Plaintiff explained that it causes her widespread pain, constant headaches, "extremely sensitive skin," and fatigue.  (Id. at 307.)  Her symptoms are constant, but are sometimes worse than other times.  (Id.)  In a typical week, she has approximately three "good" days; the rest are "bad."  (Id. at 307-08.)  On a bad day, she does not want to move and wants to sleep more.  (Id. at 308.)  She will sleep three to four hours during the day.  (Id.)  She will also spend another four to five hours lying down.  (Id.)  She has a constant, mild headache that occasionally gets worse and is a four or five on the pain scale.  (Id. at 309.)  In addition to these headaches, she has migraines three to four times a week.  (Id.)  These cause her extreme pain and, sometimes, nausea.  (Id.)  When she has a migraine, she turns off the lights, shuts the door, and lies down.  (Id.)  The migraine medications she takes help if there is no nausea.  (Id. at 310.)  It takes thirty to forty-five minutes for relief.  (Id.)  Once every few months, the migraines cause her to be dizzy, feel light-headed, and forget what she is doing.  (Id. at 310-11.)  These atypical migraines last approximately fifteen minutes.  (Id. at 311.)

Also, Plaintiff has ringing in her ears, making it hard sometimes for her to hear what is being said.  (Id.)  The fibromyalgia hurts from the top of her head to her hands and down

her back to her calves.  (<u>Id.</u> at 311-12, 312-13.)  Three to four times a week, it causes her hands to cramp and lock for three to twenty minutes.  (<u>Id.</u> at 312.)  This has been happening for the four or five past years, but is becoming more frequent.  (<u>Id.</u>)  And, Plaintiff is becoming sensitive to more and more foods.  (<u>Id.</u> at 313.)  It is suspected that she might have irritable bowel syndrome.  (<u>Id.</u>)  Her energy level is very low.  (<u>Id.</u>)  She has been diagnosed with restless leg syndrome; this causes her difficulties when trying to go to sleep.  (<u>Id.</u> at 314.)

Additionally, Plaintiff suffers from depression.  (<u>Id.</u> at 315.)  She was in counseling, but could not afford to continue after the community health center closed.  (<u>Id.</u>)  Because of the depression, she cries easily and is often sad.  (<u>Id.</u>)  She has had these crying spells for approximately twenty years.  (<u>Id.</u> at 316.)  She has several anxiety attacks a day and has panic attacks that cause her heart to race.  (<u>Id.</u> at 316-17.)  The latter occur once a week, last between forty-five minutes to two hours, and make her feel safe only when at home with her family.  (<u>Id.</u> at 317.)

Plaintiff's medications cause her to be tired.  (<u>Id.</u> at 318.)  The oxycodone she takes for pain causes her to be "very awake and talkative."  (<u>Id.</u>)

Plaintiff's husband and children do most of the housework.  (<u>Id.</u>)  "With trouble," she goes shopping.  (<u>Id.</u>)  She has to lean on the cart, have her children get the items on the bottom shelves, and take breaks.  (<u>Id.</u> at 319.)  She never shops on bad days.  (<u>Id.</u>)  She can only drive for approximately thirty minutes before starting to hurt and getting tired.  (<u>Id.</u>)  On bad days, she watches television but does not do anything else, including getting dressed or

bathing.  (Id. at 319-20.)  On good days, she gets dressed, puts her hair in a ponytail, watches television, and, sometimes, plays board games with her children.  (Id. at 320.)

Plaintiff can comfortably sit for thirty minutes and stand for ten minutes before having to change positions.  (Id. at 320.)  She cannot walk longer than twenty minutes before having to sit or lie down.  (Id.)  She cannot lift anything heavier than ten pounds.  (Id.)  She can lift a gallon of milk with one hand.  (Id. at 321.)

Mr. Hammond, testifying without objection as a vocational expert (VE), was asked to assume a hypothetical individual of Plaintiff's age, twelfth-grade education,[4] and work experience who is limited to lifting twenty pounds occasionally and ten pounds frequently and who needs to alternate every hour for a minute or two between sitting and standing.  (Id. at 323.)  This claimant can stand and walk for a total of six hours out of eight, but cannot climb ladders, ropes, or scaffolds and can only occasionally balance, kneel, crouch, crawl, stoop, and climb ramps and stairs.  (Id. at 323-24.)  She cannot be exposed on a prolonged basis to temperature extremes, on a concentrated basis to pulmonary irritants, and on any basis to whole-body vibrations.  (Id. at 324.)  She can perform only simple, routine tasks with superficial interaction with co-workers, supervisors, and the general public.  (Id.)

The VE testified that this claimant cannot perform any of Plaintiff's past relevant work but can perform other jobs.  (Id.)  Specifically, she can work as an assembler II or bench assembler.  (Id.)  At the sedentary level, the claimant can perform work as an assembler of eyeware, a semi-conductor bonder, and a circuit board screener.  (Id.)

---

[4]See note 3, supra.

If this hypothetical claimant can sit for thirty minutes, can stand for ten minutes, and has to alter positions often, the light positions will be eliminated but not the sedentary ones. (Id. at 326.)  If this person has bilateral manipulative restrictions in that she can only occasionally reach, handle, push, and pull, the positions of assembler and bonder will be eliminated; the screener position will not be.  (Id. at 326-27.)

The VE further testified that an assembler can be off-task for approximately five to six percent of the time.  (Id. at 328.)  After a probationary period, a worker cannot miss more than one and one-half days of work a month.  (Id.)

The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles* (DOT) and with the *Selected Characteristics of Occupations*.  (Id. at 328-29.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of her physical and mental abilities.

When applying for SSI, Plaintiff completed a Disability Report, disclosing that she had stopped working on January 21, 2009, for reasons other than her impairments.  (Id. at 136.) Specifically, she was "let go."  (Id.)  Because of her impairments, she was unable to work as of August 16, 2010.  (Id.)  Her current medications include gabapentin, ibuprofen, Tylenol, and Lisinopril.  (Id. at 138.)  The Lisinopril is for high blood pressure; the other medications are for pain.  (Id.)

Plaintiff also completed a Function Report.  (Id. at 102-09.)  Asked to describe what she does from waking up to going to bed at night, Plaintiff explained that she wakes up her daughters, reminds them of their school supplies, hugs them goodbye, lies down, takes a nap, wakes up and sits on the couch, watches television, lies down on the couch and watches television, greets her daughters when they get off the bus, lies down on the couch and watches television, and goes to bed.  (Id. at 102.)  She takes ibuprofen and Tylenol every four hours.  (Id.)  Asked if she takes care of anyone else, she replied that she watches her children.  (Id. at 103.)  Her husband shops, cooks, and, when he can, cleans.  (Id.)  When he cannot, their oldest daughter cooks and cleans.  (Id.)  Their youngest daughter feeds their pets and cleans.  (Id.)  Because of her pain, Plaintiff wakes up throughout the night.  (Id.)  She has to sit down when getting dressed or taking a shower; her husband brushes her hair.  (Id.)  Once a month, she prepares a meal by baking frozen foods.  (Id. at 104.)  She goes outside once or twice a week, but does not drive because she gets sleepy.  (Id. at 105.)  Once a month, she shops for groceries.  (Id.)  This takes two to three hours because she has to take a lot of breaks.  (Id.)  Her only hobby is watching television.  (Id. at 106.)  She used to read and do crafts, but can no longer because of the pain.  (Id.)  She attends Girl Scout meetings and visits with friends while sitting down.  (Id.)  Her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, see, remember, concentrate, climb stairs, complete tasks, use her hands, and get along with others.  (Id. at 107.)  She cannot walk farther than ten feet before having to stop and rest for at least ten minutes.  (Id.)  She cannot lift anything heavier than one pound.  (Id.)  If she does not have a migraine, she can follow

written or spoken instructions.  (Id.)  She gets along well with authority figures, but has been fired because people like to gossip about her.  (Id. at 108.)  She does not handle stress or changes in routine well.  (Id.)  She has a panic attack if she is away from home for longer than three hours.  (Id.)  She wears glasses and, when she has to walk or when her knees, hips, or back hurt, she uses a cane and wears a brace.  (Id.)

Plaintiff's husband completed a Function Report on her behalf.  (Id. at 113-20.)  His answers generally mirror hers.  (Id.)

A list of Plaintiff's annual earnings indicates sporadic, low earnings.  (Id. at 88.)  Specifically, she had annual earnings of $1459[5] in 1994; $5,235 in 1995; $1558 in 1997; $8765 in 1999; $3615 in 2001; $7271 in 2002; $15,492 in 2007; $13,639 in 2008; and $451 in 2009.  (Id. at 88.)  The job she had held the longest was as cashier.  (Id. at 95.)

The relevant medical records before the ALJ are summarized below in chronological order beginning with Plaintiff's visit to Wendell A. Nickerson, D.O., in March 2007 for complaints of a persistent cough and headaches since the previous January.  (Id. at 170.)  She was prescribed antibiotics, an anti-inflammatory medication, and an antihistamine.  (Id.)  Plaintiff returned two weeks later.  (Id. at 169.)  Her cough was better; her ears were stopped up.  (Id.)  Her diagnoses included depression and fibromyalgia.  (Id.)  It was noted that she was a smoker.  (Id.)  Elavil (a brand form of amitriptyline), an antidepressant, and Prozac, a selective serotonin reuptake inhibitor (SSRI) antidepressant, were prescribed in addition to the anti-inflammatory medication previously prescribed.  (Id.)

---

[5]All amounts are rounded to the nearest dollar.

In July 2009, Plaintiff returned to Dr. Nickerson with a complaint of a swollen face and bad teeth. (Id. at 168.) He noted that she had multiple cavities and diagnosed a dental abscess. (Id.) Fibromyalgia and depression were not included in the list of diagnoses. (Id.)

On August 16, 2010, Plaintiff saw Dr. Nickerson for blood pressure problems, agitation, and confusion. (Id. at 167.) Her husband reported that she often repeated herself. (Id.) Also, her muscles felt sore. (Id.) She had been taking citalopram for the past month. (Id.) She was told to stop taking it and the amitriptyline and was diagnosed with serotonergic syndrome. (Id.)

One week later, she informed Dr. Nickerson that, although she was no longer agitated, she was still having mood swings. (Id. at 166.) The antihistamine, Benadryl, previously prescribed was not helping. (Id.) The night before she had felt like she was having a heart attack. (Id.) On examination, she had pain, but no swelling, in her left knee. (Id.) Her speech was slurred. (Id.) She was diagnosed with serotonergic syndrome, behavior disorder, and osteoarthritis. (Id.) The dosage of Benadryl was reduced; gabapentin, used in the treatment of nerve pain, was prescribed. (Id.)

In September, Plaintiff saw Dr. Nickerson because her blood pressure would not stay down. (Id. at 165.) She was still taking the gabapentin, but not the Benadryl. (Id.) Dr. Nickerson noted that Plaintiff described "atypical symptoms," including atypical migraines. (Id.) Gabapentin was continued; an antibiotic, Keflex, and two medications for high blood pressure, Hyzaar and Lisinopril, were also prescribed. (Id.) Plaintiff was to return in one month. (Id.)

On October 1, Dr. Nickerson noted that Plaintiff had not filled her gabapentin prescription. (Id.) On examination, she had a regular heart rate and rhythm, tenderness in her neck, and wheezing and crackling sounds in her lungs. (Id.) Plaintiff reported she was suffering from insomnia, fatigue, and pins and needles in her arms; she was "very teary." (Id.) Dr. Nickerson diagnosed Plaintiff with hypertension, depression, fibromyalgia, tobacco abuse, and dyspareunia (painful intercourse). (Id.) Tylenol #3[6] was prescribed. (Id.) Plaintiff was to return in one month. (Id.)

On October 14, Plaintiff sought mental health treatment at the Community Health Center (CHC). (Id. at 143-49, 198-99, 223-28, 234.) She reported on a Biopsychosocial History form that she had a disability application pending and needed help dealing with "things." (Id. at 143.) Her medical problems included serotonin syndrome,[7] fibromyalgia, osteoarthritis, and migraines. (Id.) Her only medication was for blood pressure. (Id.) She was in constant pain. (Id. at 144.) She had been fired in 2008 from her last job, that of a cashier. (Id.) Her hobbies include watching television and the Girl Scouts. (Id. at 145.) Her strategy for dealing with life's problems is to become calm and talk. (Id. at 146.) Katie Douglas, L.P.C.,[8] described Plaintiff as cooperative, tearful, and with fair eye contact and a congruent mood and affect. (Id. at 149.) Plaintiff reported that her serotonin syndrome did

---

[6]Tylenol #3 is Tylenol, acetaminophen, with codeine, an opioid pain medication, prescribed to relieve moderate to severe pain. See Tylenol with Codeine #3, http://www.drugs.com/mtm/tylenol-with-codeine-3.html (last visited Jan. 26, 2015).

[7]See note 1, supra.

[8]Licensed Professional Counselor.

not allow her to take the antidepressants she needed. (Id.) She was having financial and occupational difficulties, but had a strong support system. (Id.) A plan was to be developed at the next session. (Id.) Plaintiff was diagnosed with major depressive disorder, recurrent, severe, non-psychotic, and a Global Assessment of Functioning (GAF) of 45.[9] (Id. at 148.)

The next week, Plaintiff saw Ms. Douglas and was described as being pleasant and cooperative and having a good eye contact and a bright affect. (Id. at 150, 233.) She reported that her mood was "much better" that day as she was having a "great day" and trying to do a lot. (Id.) She had a hard time limiting herself when she felt good. (Id.) Under the heading of "Plan," the notes read that the current plan was to be continued. (Id.)

The following week, on October 28, Plaintiff told Ms. Douglas that she was having an average day. (Id. at 151, 232.) No new plan was developed. (Id.)

When seeing Dr. Nickerson on November 10, Plaintiff reported that the Tylenol #3 was not working. (Id. at 163.) She was having bad gas, nausea, heartburn, and diarrhea. (Id.) A "disability dr." wanted an x-ray of her knees and back. (Id.) On examination, she had mild to moderate tenderness on palpation of her upper and lower extremities; mild crepitus,

---

[9]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

or crackling, in her lungs when coughing; and positive Phalen's and Tinel's sign.[10] (Id.) She was diagnosed with hypertension, depression, dyspareunia, fibromyalgia, tobacco abuse, and carpal tunnel syndrome. (Id.) Hydrocodone and Lasix (for hypertension) were prescribed in addition to the Lisinopril. (Id.)

At her December visit to Dr. Nickerson Plaintiff complained of a cough present since August. (Id. at 262.) She was diagnosed with sinusitis and bronchitis and prescribed an antibiotic, erythromycin, and an antihistamine, Phenergan with codeine. (Id.)

In January 2011, Plaintiff reported to Dr. Nickerson that her cough was not much better and that she had not been able to fill her blood pressure medication that month due to the cost. (Id. at 261.) On examination, her voice was raspy and hoarse. (Id.) Dr. Nickerson noted that she had crepitus, or popping, in her right knee. (Id.) Her diagnoses included chronic cough/bronchitis, anxiety disorder, fibromyalgia, tobacco abuse, and uncontrolled hypertension. (Id.)

Plaintiff returned to Dr. Nickerson on February 9, explaining that she was now on Medicaid and wanted to pursue treatment for her various ailments. (Id. at 260.) She had just started taking her blood pressure medication again that morning. (Id.) He noted that Wellbutrin was the only medication she could use for her depression and fibromyalgia due to her history of serotonergic syndrome. (Id.) His diagnoses included chronic allergies,

---

[10]Tinel's and Phalen's tests are used in the diagnosis of carpal tunnel syndrome. See Jonathan Cluett, M.D., Carpal Tunnel Syndrome http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel (last visited Jan. 8, 2015). A Tinel's sign is present when tingling in the fingers is made worse by tapping the median nerve along its course in the wrist. Id. A Phalen's sign is present when pushing the back of the hands together causes the complained-of symptoms. Id.

endometriosis, fibromyalgia, depression, fatigue, and history of hyperlipidemnia. (Id.) In addition to the Wellbutrin, Dr. Nickerson prescribed gabapentin, Singulair (to prevent asthma attacks), and hydrocodone. (Id.) The results of various lab tests were discussed with Plaintiff the following week. (Id. at 259.) Dr. Nickerson noted that she had "flight of ideas and speed of speech," but was generally okay. (Id.)

On March 24, Plaintiff reported to Dr. Nickerson that her pain medications were not helping. (Id. at 258.) She had pain in her sacral and lumbar spine with possible radiculopathy. (Id.) She also was having migraines twice a week. (Id.) These were described as being "new onset." (Id.) Examination findings were within normal limits. (Id.) Back pain and migraines were added to her previous diagnoses; Topamax, the use of which had resolved her husband's migraines,[11] was added to her prescriptions. (Id.) X-rays were to be taken of her spine, pelvis, and hips. (Id.) Lumbar spine x-rays revealed no acute fractures and minimal retrolisthesis of L3 on L4 and L4 on L5. (Id. at 270.) An x-ray of her pelvis revealed no acute bony abnormalities. (Id. at 271.) A magnetic resonance imaging (MRI) was recommended if avascular necrosis was suspected. (Id.) X-rays of her hips also showed no acute bony abnormalities. (Id. at 272.) The same recommendation was made. (Id.)

Plaintiff saw Dr. Nickerson on March 28 for a sore throat and cough. (Id. at 257.) She was diagnosed with bronchitis and pharyngitis and prescribed antibiotics. (Id.)

---

[11] See page 2, supra.

Four days later, she returned to discuss the results of her x-rays. (Id. at 256.) She was referred to a gynecologist for a consultation for her pelvic pain. (Id.)

Three days later, on April 4, she again saw Dr. Nickerson, reporting that the Wellbutrin was not helping as much with her depression as it had when she first started taking it. (Id. at 255.) The dosage was increased. (Id.) She returned on April 29 for a recheck, reporting that she felt better and was not having any side effects of the Wellbutrin. (Id. at 254.) Examination findings, including of extremities, were within normal limits with the exception that Plaintiff was having tingling in her legs and pain in her back that was intermittently debilitating. (Id.) She had had a bad bout of fibromyalgia a few days earlier and had been sleeping a lot for the past month. (Id.) The gynecologist she had consulted wanted her to see a gastrointestinal (GI) specialist. (Id.) Plaintiff was continued on Wellbutrin and prescribed Phenergan. (Id.)

Eight days later, on May 7, Plaintiff returned with complaints of severe back pain, right flank pain, and urinary difficulties. (Id. at 253.) Also, she was concerned that her husband was unable to leave the house due to his depression. (Id.) She was diagnosed with dysuria (difficulty urinating), fibromyalgia, a probable urinary tract infection, and situational anxiety/depression. (Id.) She was prescribed an antibiotic, Cipro, and a nonsteroidal anti-inflammatory drug (NSAID), Toradol. (Id.)

Ten days later, Plaintiff consulted Dr. Nickerson for her intermittent panic attacks. (Id. at 252.) She was tearful. (Id.) Her urinary tract infection had cleared, and Toradol was helping her back pain. (Id.) She was diagnosed with anxiety behavior disorder, fibromyalgia,

chronic back pain, and osteoarthritis/degenerative joint disease. (Id.) Another dosage of Wellbutrin was prescribed, as was Xanax, used to treat anxiety disorders, and Naprosyn, a NSAID. (Id.)

Plaintiff consulted Dr. Nickerson on June 3 for concerns that her right big toe was infected after sustaining a cut when an oxygen tank fell on it. (Id. at 251.)

On June 15, Plaintiff complained to Dr. Nickerson about constant pain in the right side of her back for the past several days. (Id. at 250.) On examination, Plaintiff was tender throughout her abdomen. (Id.) The GI consultant had ordered a computed tomography (CT) scan of her abdomen and an ultrasound of her pelvis, but she was unable to afford to make the trip to have either performed. (Id.) Dr. Nickerson noted that Plaintiff was taking only one-half of her Xanax dosage at night and consequently still had a month's supply of the medication. (Id.) He ordered an ultrasound of her pelvis and prescribed Toradol. (Id.) The ultrasound was unremarkable, with the exception of her left ovary not being visible. (Id. at 269, 276.)

When seen by Dr. Nickerson on July 11 to discuss the test results, Plaintiff had generalized tenderness in her abdomen, which was very severe on the left side. (Id. at 249.) She was tearful and guarded. (Id.) She reported that the ultrasound had been painful. (Id.) Dr. Nickerson ordered a CT scan of her abdomen and pelvis and prescribed her hydrocodone and ibuprofen. (Id.) The CT scans were unremarkable. (Id. at 268, 274.)

Plaintiff returned to CHC on July 18 and was seen by Janet Hultgrew, M.S.W., L.C.S.W. (Id. at 211-12, 229-31.) Plaintiff marked on a Family Health Survey that, during

the past month, she had had headaches, dizziness, shortness of breath, digestive problems, trouble sleeping, fatigue, and pain in her stomach, back, extremities, and chest. (Id. at 211.) She had also experienced feelings of anhedonia, being out of control, anxiety, nerves, depression or hopelessness, and worries about a variety of things. (Id.) She rated her overall health as "fair," one step above "poor." (Id.) She rated her relationship with her partner as fair and with peers and other family members as good. (Id. at 212.) Plaintiff reported that she was upset because her marriage was in trouble due to various stresses, including financial. (Id. at 229.) She was filing for disability. (Id.) Her husband had been receiving disability since 2008 because of steroid psychosis, resulting in migraine-caused seizures and "motor spells." (Id. at 230.) Plaintiff's diagnoses were fibromyalgia, depression, and serotonin syndrome. (Id.) She was diagnosed with major depressive disorder, recurrent, mild. (Id. at 194.)

Plaintiff returned to Dr. Nickerson the next day, explaining that she was seeing a counselor but her husband was refusing to see a marriage counselor. (Id. at 248.) Her hypertension was poorly controlled. (Id.) She was prescribed Wellbutrin and meloxicam (a NSAID to replace the Naprosyn, which was causing Plaintiff to be nauseous) in addition to the Xanax. (Id.)

In July, Plaintiff saw Dr. Nickerson for complaints of pain in her mid-back and neck. (Id. at 247.) There are no examination findings; his diagnosis and treatment plan notes are illegible. (Id.)

In August, Plaintiff reported to Dr. Nickerson that her depression was getting worse and that the counseling clinic she had been attending had closed. (Id. at 246.) She was tearful. (Id.) Although she had suicidal thoughts, she would not act on them because of her daughters. (Id.) She had not been taking Xanax for the past three weeks and was going to resume taking it. (Id.)

Plaintiff saw Dr. Nickerson again on September 15 for worsening knee pain and allergies. (Id. at 245.) Her inhaler had expired. (Id.) Dr. Nickerson told her to reduce her smoking to six cigarettes a day. (Id.) He noted that the arthritis medications' side effects were water retention and an increase in blood pressure. (Id.) He diagnosed Plaintiff with tobacco abuse, acute bronchitis, peripheral edema, asthma, and arthralgia. (Id.) He renewed her inhaler prescription. (Id.)

Plaintiff returned on September 24 to discuss her medications, specifically the hydrocodone which was causing her skin to itch and her anxiety to increase. (Id. at 244.) There are no examination findings. (Id.) She was diagnosed with an acute episode of fibromyalgia, chronic allergies, behavioral disorder, and hypertension. (Id.) Her prescriptions included Topamax and Percocet. (Id.)

On October 7, Plaintiff saw Dr. Nickerson for a refill of her alprazolam and for treatment of her increased anxiety caused by severe marriage stress. (Id. at 243.) On examination, all findings were within normal limits with the exception of her tears, anxiety, and agitation. (Id.) Xanax was prescribed. (Id.) Three weeks later, she saw him for back

discomfort. (Id. at 242.) There are no examination findings; the diagnoses and plan are illegible. (Id.)

In November, Plaintiff consulted Dr. Nickerson for her complaints of back and right hip discomfort and to discuss family stress. (Id. at 241.) The next month, she told him she wanted to go back on Naprosyn; it was prescribed. (Id. at 240.)

In January 2012, Plaintiff saw Dr. Nickerson for trouble she was having hearing out of her left ear and for nasal congestion. (Id. at 239.) "[O]therwise [she was] just checking in." (Id.) He noted that she had an appointment with a psychiatrist. (Id.)

Plaintiff returned in March, complaining of congestion, sore throat, earaches, coughing, and an aching chest for past week. (Id. at 238.) She was prescribed antibiotics and Percocet, a combination of acetaminophen and oxycodone. (Id.) In April, she complained to Dr. Nickerson of back pain and recent episodes of nausea when eating peanuts and similar foods. (Id. at 237.) She reported that the Percocet was causing insomnia. (Id.) She was diagnosed with an exacerbation of her fibromyalgia, restless leg syndrome, hypertension, mild peanut allergy, osteoarthritis/degenerative joint disease, depression/anxiety, and mood disorder/bipolar. (Id.) In May, she discussed with him her eating habits; she was constantly hungry for proteins. (Id. at 236.) There are no examination findings. (Id.) Dietary choices were discussed. (Id.)

Later in May, Plaintiff was seen by Mary Chapel, N.P., with the Hannibal Clinic, for complaints of right hand pain after hitting that hand on a table. (Id. at 281-83.) On examination, she had a weak right hand grip, occasional tingling in her right thumb,

tenderness in that thumb on palpation, and no swelling or numbness.  (Id. at 281.)  X-rays of the hand were normal.  (Id. at 282, 283.)  She was given a splint for the thumb, prescribed a NSAID, and told to follow up with her primary care physician if the symptoms had not resolved within a week.  (Id. at 282.)

Also before the ALJ were assessments of Plaintiff's mental and physical impairments and their resulting limitations.

In October 2010, Plaintiff was evaluated by Stephen R. Bergman, D.O., pursuant to her SSI application.  (Id. at 152-57.)  Dr. Bergman opined that Plaintiff's serotonergic syndrome was probably caused by the combination of amitriptyline, prescribed for fibromyalgia and sleep difficulties, and citalopram, prescribed for depression.  (Id. at 152.)  Plaintiff reported that her pains had begun in 2004; her anxiety and panic attacks began when she was a child; her headaches have always been present; her depression began when she was a child; and her low energy level and chronic fatigue began years earlier.  (Id.)  Her pains had become severe and chronic in recent years; her panic attacks had become significant when she was working at Wal-Mart.[12]  (Id.)  Her pain level varied between a two and ten, but was generally between a four and eight.  (Id.)  She described the pain as having a constant, dull aching quality with occasional sharp or throbbing pains.  (Id.)  Dr. Bergman noted that Plaintiff showed extreme emotional lability during the interview, quickly changing from smiling and being seemingly happy to being tearful and sad.  (Id.)  Plaintiff further reported that she avoided extensive activities and did not like to stand or walk for longer than fifteen

---

[12]Her earnings record indicates that this was in 2008.  (See id. at 91.)

minutes at a time.  (Id. at 153.)  She could prepare her own meals and perform her activities of daily living, but sometimes needed help with shopping, reading, writing, or rising from a seated position.  (Id.)  She smoked one pack of cigarettes a day, and had done so for twenty-one years.  (Id.)  On examination, Plaintiff was sensitive to palpation in her hips, lower extremities, shoulders, neck, and head.  (Id. at 152-53.)  She was 5 feet 6 inches tall and weighed 268 pounds.  (Id. at 153.)  She was alert and oriented to time, place, and person.  (Id.)  She had a normal, smooth, and symmetrical gait; deep tendon reflexes that were two out of four; strength that was five out of five bilaterally in her upper and lower extremities, including her grip; and "decent dexterity and fine finger movements."  (Id.)  She had no sensory deficits in her upper and lower extremities and could hear and speak adequately.  (Id.)  She had a full range of motion in her shoulders, elbows, wrists, hips, ankles, and spine.  (Id. at 154, 156-57.)  She had "multiple tender points that [were] consistent with fibromyalgia."  (Id. at 154.)  Dr. Bergman diagnosed Plaintiff with fibromyalgia syndrome, recent history of serotonin syndrome, history of controlled hypertension, symptoms of major depression, history of polycystic ovarian syndrome, and chronic obesity and pain of the low back, neck, hips, shoulders, and knees.  (Id.)  "Based on [that day's] history and physical examination," he opined that Plaintiff was "a very emotionally fragile woman with some significant chronic pain consistent with fibromyalgia syndrome."  (Id.)  Her serotonin syndrome limited her choice of medications to treat her depression and fibromyalgia, "making it difficult for her to function normally as a human being."  (Id.)

Four days later, Plaintiff had a psychological evaluation by Frank Froman, E.D., a clinical psychologist.  (Id. at 158-62.)  Dr. Froman observed that Plaintiff was "casually and neatly attired and of excellent hygiene."  (Id. at 158.)  Plaintiff had attended an alternative school "because she was depressed, isolated, and felt hated."  (Id.)  She had graduated from the twelfth grade.  (Id.)  She complained of fibromyalgia, serotonergic syndrome, osteoarthritis in her knees, chronic pain, fatigue, and episodes of significant and severe hypertension.  (Id.)  Due to financial restrictions, Plaintiff could only afford Lisinopril and an occasional Tylenol #3.  (Id. at 158, 160.)  She took ibuprofen and regular Tylenol every four hours.  (Id. at 158.)  Plaintiff "presented in a slightly anxious but otherwise normalized fashion."  (Id. at 159.)  She had an excellent ability to relate; good eye contact; and clear, appropriate, easily understood, and relevant speech with a normal rate, rhythm, and content. (Id.)  She had constant ringing in her ears.  (Id.)  She enjoyed socializing.  (Id.)  She smoked between one to three packs of cigarettes a day, depending on her mood and pain level.  (Id.) She had a driver's license, but did not drive very far because she tended to fall asleep.  (Id.) Her hobby was watching television.  (Id.)  Reading and doing chores hurt.  (Id.)  She got up between six or seven times at night and took a daily nap.  (Id.)  She took care of her personal hygiene tasks, with the exception of her husband brushing her hair.  (Id.)  On examination, Plaintiff was oriented to time, place, and person.  (Id. at 160.)  She appeared to be of average intelligence.  (Id.)  "She easily added, subtracted, multiplied and performed Serial 7's."  (Id.)

She complained of short-tem memory problems, panic attacks when away from home, and mood swings.  (Id.)  Dr. Froman rated her GAF as 60.[13]  (Id.)  He concluded that

> [Plaintiff] is a person who will have "good and bad days."  During her good days, she appears easily able to function, and can satisfy the needs of most employers.  During her bad days, it is quite unlikely that she would be able to do so.  She appears able to perform simple one or two step assemblies at a competitive rate, but will be limited significantly and likely severely by her fibromyalgia and chronic pain.  She is able to relate adequately to co-workers and supervisors.  She can understand oral and written instructions and manage her own benefits.
>
> During her good days, she will likely be able to withstand the stress associated with customary employment as long as it is "light."  During her bad days, it is unlikely that she would be able to do so.

(Id.)

As part of her evaluation, Plaintiff completed a Goldberg Depression Scale, rating how she felt during the past week in respect to eighteen items.  (Id. at 162.)  On the six-point scale, with 0 being "not at all" and 5 being "very much," Plaintiff rated five of the items as a five: her future seemed hopeless; she had lost interest in aspects of life that used to seem important to her; she felt fatigued; she felt like a failure; and her sleep was disturbed.  (Id.)  Two items were rated a 4, "quite a lot":  she felt sad, blue, and unhappy and it took great effort for her to do simple things.  (Id.)  One item, it was hard for her to concentrate on reading, was a 3, "moderately."  (Id.)  Three items were a 2, "somewhat"; three were a 1, "just a little"; and four were a 0.  (Id.)

---

[13]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

In December 2010, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Sharon A. Falter, a single decision-maker.[14]  (Id. at 26-31.)  The primary, and only, diagnosis was fibromyalgia.  (Id. at 26.)  This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and sit, stand, or walk for approximately six hours in an eight-hour day.  (Id. at 27.)  Her abilities to push and pull were otherwise unlimited.  (Id.)  She had postural limitations of only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing, ramps, stairs, ladders, ropes, and scaffolds.  (Id. at 28.)  She had no manipulative, visual or communicative limitations.  (Id. at 28-29.)  She had environmental limitations of needing to avoid concentrated exposure to extreme cold and heat, to vibrations, and to hazards, e.g., machinery and heights.  (Id. at 29.)

The same month, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Mark Altomari, Ph.D.  (Id. at 171-82.)  Plaintiff was assessed as having an affective disorder, i.e., major depressive disorder, that caused mild restrictions in her daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 171, 174, 179.)  It did not cause any repeated episodes of decompensation of extended duration.  (Id. at 179.)

---

[14]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

On a Mental Residual Functional Capacity Assessment form, Dr. Altomari assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 183.) In the area of sustained concentration and persistence, Plaintiff was moderately limited in two of the eight listed abilities, i.e., (i) carrying out detailed instructions and (ii) maintaining attention and concentration for extended periods, and not significantly limited in the other six. (Id. at 183-84.) In the area of social interaction, Plaintiff was not significantly limited in any of the five listed abilities. (Id. at 184.) In the area of adaptation, she was not significantly limited in three of the four abilities and was moderately limited in her ability to respond appropriately to changes in the work setting. (Id.)

In June 2011, Dr. Nickerson completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on Plaintiff's behalf. (Id. at 187-90.) He assessed Plaintiff as being limited to occasionally lifting twenty pounds or less. (Id. at 187.) He did not assess the amount of weight she can frequently lift or carry.[15] (Id.) She can stand or walk for at least two hours in an eight-hour workday, but not for six. (Id.) She must periodically alternate sitting and standing. (Id. at 188.) She is limited in her ability to use her upper and lower extremities and cannot do repetitive motions. (Id.) She cannot balance and can only occasionally kneel, crouch, crawl, stoop, and climb. (Id.) She can only occasionally reach and handle. (Id. at 189.) Her limitations were caused by her pain and fatigue. (Id.) She is unlimited in her abilities to see, hear, and speak. (Id.) She should avoid temperature

---

[15]The choices included "less than 10 pounds." (Id.)

extremes and vibrations. (Id. at 190.) Her disability began on August 16, 2010. (Id.) Dr. Nickerson opined that Plaintiff would not be a reliable employee. (Id. at 188.)

In May 2012, Plaintiff underwent a mental health evaluation by Ted Oliver, M.S.W., L.C.S.W., to maintain her Medicaid coverage. (Id. at 278-79.) Plaintiff reported that she had had no formal psychiatric treatment, but had been taking various medications, including Wellbutrin. (Id. at 278.) On examination, she was oriented to time, place, person, and situation; was occasionally tearful; and had a sad affect, dysthymic (depressed) mood, and appropriate rate and volume of speech. (Id.) Her concentration was fair; her recent and remote memory was intact; her intellectual functioning was average. (Id.) She reported that she becomes irritable, tearful, depressed, and anxious if she does not take the Wellbutrin. (Id.) She takes alprazolam to help with panic attacks. (Id.) She reported being anxious around people for years. (Id.) She had a steroid shot every four months for symptoms of fibromyalgia. (Id.) Mr. Oliver diagnosed Plaintiff with panic disorder with agoraphobia and depressive disorder, not otherwise specified. (Id.) He rated her current GAF as 50.[16] (Id. at 279.) He opined that ongoing treatment would help her "ongoing symptoms of anxiety which impact her daily functioning." (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 22, 2010. (Id. at 17.) He next found that she had severe impairments of fibromyalgia, degenerative disc disease with retrolisthesis, obesity,

_____

[16]See note 9, supra.

migraine headaches, asthma, depression, and panic disorder with agoraphobia.  (Id.)  Also, she had impairments that were either not severe or had not persisted for twelve continuous months, i.e., serotonergic syndrome and tinnitus.  (Id.)  Plaintiff did not have, however, an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.  (Id.)  Addressing her mental impairments, the ALJ specifically found that Plaintiff had mild restrictions in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace.  (Id. at 18.)  She had not had any episodes of decompensation of extended duration.  (Id.)

Next addressing Plaintiff's residual functional capacity (RFC), the ALJ determined that she can perform light work[17] except that she needs to change positions every hour for a minute or two; she cannot climb ropes, ladders, or scaffolds; and she can only occasionally balance, stoop, kneel, crouch, crawl, or climb ramps and stairs.  (Id. at 19.)  She has to avoid whole body vibration, concentrated exposure to pulmonary irritants, and prolonged exposure to temperature extremes.  (Id.)  She is limited to performing simple routine tasks requiring only superficial interaction with coworkers, supervisors, and the general public.  (Id.)

In assessing Plaintiff's RFC, the ALJ evaluated her credibility, finding her not to be fully credible.  (Id. at 19-23.)  Specifically, he found her descriptions of her limitations to be inconsistent with the findings of Drs. Bergman and Nickerson and with diagnostic tests

---

[17] "According to the regulations, 'light work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." **Holley v. Massanari**, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing Social Security Ruling 83–10, 1983 WL 31251, at *4–5 (S.S.A. 1983))

results. (Id. at 19-21.) The ALJ discounted Dr. Bergman's opinion of Plaintiff's mental health on the grounds that Dr. Bergman had examined her for her physical, not mental, condition and that Plaintiff was not then undergoing any psychiatric treatment. (Id. at 20.) He found it significant that Dr. Nickerson had not listed fibromyalgia in his diagnoses between March 2009 and November 2010, had described her migraines in March 2011 as "new onset," had not continuously prescribed her pain medications, and had only once diagnosed her with an "*acute* episode of fibromyalgia." (Id. at 20-21.) The ALJ also discounted Dr. Froman's opinion about limitations Plaintiff would suffer from her fibromyalgia because it was outside his area of expertise. (Id. at 22.) The ALJ found that Plaintiff's work history indicated a lack of motivation to work, that she received little treatment beyond her regular visits to Dr. Nickerson, and that she had not started psychiatric treatment until almost two years after her alleged disability onset date. (Id.) Also, she did not consistently take narcotic medications or prescription medications for her migraines. (Id. at 23.) Although she had been diagnosed with serotonergic syndrome, she had been able to tolerate Wellbutrin and Xanax. (Id.) She went to doctors' appointments and went grocery shopping, contradicting the allegation she avoided going out in public due to agoraphobia. (Id.)

The ALJ gave Dr. Nickerson's medical source statement "some weight," accepting his opinion about Plaintiff's lifting limitations, her need to alternate between sitting and standing, and her exposure limitations. (Id.) He did not accept his opinion about Plaintiff's standing, walking, pushing, pulling, and manipulative limitations for the same considerations

influencing his assessment of Dr. Nickerson's treatment notes when evaluating Plaintiff's credibility. (Id.) He also did not accept Mr. Oliver's GAF finding because it was not from an acceptable medical source and was in the absence of any ongoing treatment. (Id.) The Function Report completed by Plaintiff's husband was given little weight because it mirrored hers and was inconsistent with the other evidence of record. (Id. at 24.)

The ALJ then concluded that Plaintiff cannot return to her past relevant work as a cashier but can, with her age, education, and RFC, perform other jobs that exist in significant numbers in the state and national economies, as described by the VE. (Id. at 25-25.) Plaintiff is not, therefore, disabled within the meaning of the Act. (Id. at 25.)

## Additional Medical Records Before the Appeals Council

After the ALJ rendered his decision, Plaintiff submitted additional medical records from Dr. Nickerson to the Appeals Council.

These records begin with those of her June 2012 visit for a refill of oxycodone. (Id. at 296.) Dr. Nickerson noted that Plaintiff's disability hearing was soon; there are no examination findings. (Id.) In July, Plaintiff requested an injection in the right side of her hip because she was having trouble sitting or standing for long. (Id. at 295.) An injection was given. (Id.) Again, there are no examination findings. In September, she saw him for complaints of a cough, congestion, sore throat, earaches, and runny nose. (Id. at 294.) On examination, she had a hoarse voice and non-productive cough. (Id.) She was diagnosed with bronchitis, sinusitis, and tinea otitis and prescribed antibiotics. (Id.) Two days later, she returned with complaints of back discomfort and neck pain. (Id. at 292.) The examination

findings are within normal limits, with the exception of her extremities, which are not reported. (Id.) Also, she was having situational anxiety caused by her husband's decision that he was no longer bipolar and did not need to take medication. (Id.) On October 5, Plaintiff saw Dr. Nickerson and was upset because she had been denied disability. (Id. at 291.) He diagnosed her with situational anxiety and depression/behavior disorder in addition to fibromyalgia, poorly-controlled hypertension, chronic allergies, and osteoarthritis/degenerative joint disease. (Id.) Three days later, she had an injection in her left hip, a flu shot, and a recheck of her bronchitis. (Id. at 290.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 416.920(a)[18]). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. § 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir.

---

[18]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the revision in effect at the time of the ALJ's decision.

2009).  "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)).  Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'"  **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'"  **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred by failing to properly weigh and refer to the opinions of Drs. Nickerson, Bergman, and Froman; by not contacting those providers to clarify their opinions if found wanting; and by concluding that her serotonergic syndrome is not a severe impairment. The Commissioner disagrees.

Alleging a disability onset date of August 16, 2010, Plaintiff applied for SSI the next month based on her serotonergic syndrome, fibromyalgia, migraines, depression, osteoarthritis, pain, fatigue, and panic attacks. The ALJ found her to have severe impairments of fibromyalgia, degenerative disc disease with retrolisthesis, obesity, migraine headaches, asthma, depression, and panic disorder with agoraphobia. He further found that her serotonergic syndrome is not an severe impairment.

Plaintiff was diagnosed with serotonergic syndrome on August 16, 2010 – her alleged disability onset date. She was then told to stop taking the amitriptyline and citalopram[19] she had been taking for the past month. There is no reference after this diagnosis to Plaintiff being agitated and confused. She never again took both amitriptyline and citalopram, although she was prescribed other antidepressants and pain relievers. And, although the diagnosis of serotonergic syndrome was continued to reflect that Plaintiff cannot tolerate taking two drugs simultaneously that each raise her serotonin levels, the only indication that the syndrome prejudicially interfered with her treatment is Dr. Berman's reference two months after the original diagnosis to the syndrome limiting her choice of medications to treat her depression and fibromyalgia. Plaintiff, however, was subsequently prescribed, among other things, gabapentin for nerve pain; opioid pain relievers, e.g., hydrocodone, oxycodone, and cocaine; antidepressants, e.g., Wellbutrin and Xanax; and NSAIDs, e.g., Toradol, Naprosyn, and meloxicam. As noted above, if an impairment does not significantly limit a claimant's physical or mental ability to do basic work activities it is not severe. **Nguyen v. Chater**, 75 F.3d 429, 430-31 (8th Cir. 1996). It is the claimant's burden to show that an impairment is severe. **Id.** Accord **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001). Plaintiff has failed to show that her serotonergic syndrome is a severe impairment. Rather, the evidence is that the syndrome affects the combination of medications she may be prescribed but has not sufficiently limited her choice of medications as to be considered a severe impairment.

---

[19]See note 1, supra.

Plaintiff argues that the ALJ erred by failing to give Dr. Nickerson's medical source statement controlling weight. It is undisputed that Dr. Nickerson was Plaintiff's treating physician at all times relevant. See 20 C.F.R. § 416.902 (defining "treating source" as a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant]."). Several of the limitations noted in his Medical Source Statement were incorporated by the ALJ in his RFC findings: the lifting limitations, the need to alternate between sitting and standing, and the need to avoid temperature extremes and vibrations. The ALJ did not accept Dr. Nickerson's assessment of Plaintiff's limitations in the length of time she can stand or walk, in the use of her upper and lower extremities, in doing repetitive motions, and in reaching and handling.

The assessment at issue was done on June 3, 2011. Plaintiff's visit that same day was for a cut on her big toe. She saw Dr. Nickerson twice the month before, once for back and flank pain and situational depression and once for intermittent panic attacks. The other eleven visits that occurred between her disability onset date and April 2011, inclusive, were for a variety of complaints which, together with the diagnoses, seldom repeated from one visit to the next. Each office note included a checklist for the findings of a physical examination – the results were usually within normal limits if marked at all; two lines for a summary of her complaints; two lines for his comments; six numbered lines for his assessment; and three lines for his treatment plan.

It is undisputed that Dr. Nickerson is Plaintiff's treating physician, having first seen her in March 2007 and being her only consistent health care provider thereafter. See 20 C.F.R. § 416.902 (defining "treating source" as a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant]."). "The regulations provide that if the ALJ finds 'that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record,* [the ALJ] will give it controlling weight.'" **Wagner**, 499 F.3d at 848-49 (quoting 20 C.F.R. § 404.1527(d)(2)). Thus, "while a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Id.** at 849 (internal quotations omitted).

There is nothing in the record to support Dr. Nickerson's limitations on Plaintiff's use of her upper and lower extremities. Eight months earlier, Plaintiff had had full strength in her upper and lower extremities, including her grip; "decent dexterity and fine finger movements"; and a full range of motion in her shoulders, elbows, wrists, hips, ankles, and spine. (R. at 153.) His treatment notes during that eight-month period do not include examination findings supportive of the rejected limitations. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009); accord **Turpin v.**

- 36 -

__Colvin__, 750 F.3d 989, 993 (8th Cir. 2014).  Thus, in __Cline v. Colvin__, 771 F.3d 1098, 1104

(8th Cir. 2014), the Eighth Circuit Court of Appeals affirmed the Commissioner's decision to

*partially* credit the opinion of the claimant's treating physician whose "cursory checklist

statement also include[d] significant . . . limitations that are absent from his treatment notes

and [the claimant's] medical records."  And, in __Johnson v. Astrue__, 628 F.3d 991, 994 (8th

Cir. 2011), the court noted the use by one of the claimant's treating physicians of the Medical

Source Statement form – "consist[ing] of a series of check marks assessing [RFC]" – and held

that the ALJ may discount the "conclusory opinions" reflected in the MSS "if contradicted by

other objective medical evidence in the record."  See also __Reed v. Barnhart__, 399 F.3d 917,

921 (8th Cir. 2005) (noting that the court "[has] upheld an ALJ's decision to discount a

treating physician's MSS where the limitations listed on the form 'stand alone' and were 'never

mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective

testing or reasoning'") (second alteration in original).

His notes do, however, sporadically refer to Plaintiff's complaints of pain and fatigue.

An ALJ may discount a treating physician's opinion that is based on the claimant's subjective

complaints.  See __Renstrom v. Astrue__, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly

gave treating physician's opinion non-controlling weight when, among other things, that

opinion was largely based on claimant's subjective complaints); __Kirby v. Astrue__, 500 F.3d

705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's

statement as to claimant's limitations because such conclusion was based primarily on

claimant's subjective complaints and not on objective medical evidence).  The ALJ's assessment of Plaintiff's credibility is not challenged.

Plaintiff further argues that the ALJ's failure to recognize that Dr. Nickerson's opinions are supported by the evidence of her fibromyalgia is a failure to understand fibromyalgia. "[F]ibromyalgia is a chronic condition which is difficult to diagnose and *may* be disabling." **Pirtle v. Astrue**, 479 F.3d 931, 935 (8th Cir. 2007) (emphasis added).  <u>See</u> also **Forehand v. Barnhart**, 364 F.3d 984, 987 (8th Cir. 2004) ("We have long recognized that fibromyalgia has the *potential* to be disabling.") (emphasis added).  The diagnosis itself does not establish disability as is evident from the diagnosis first appearing in Plaintiff's March 2007 medical record – forty-one months before her alleged disability onset date.  And, unlike the ALJ in **Tilley v. Astrue**, 580 F.3d 675, 681 (8th Cir. 2009), cited by Plaintiff, the ALJ did address her fibromyalgia and found her to have several resulting physical limitations.

Plaintiff also challenges the ALJ's failure to give weight to Dr. Froman's opinion as to her physical limitations and Dr. Bergman's opinion as to her mental limitations on the grounds that those opinions were outside the area of expertise of those consulting examiners.

As noted above, Dr. Bergman, a consulting physician, conducted a physical examination of Plaintiff in October 2010 pursuant to her SSI application.  At that time, Plaintiff had recently been diagnosed with serotonergic syndrome and was consequently only taking Tylenol #3, had consulted a counselor the day before but had not yet been treated by her, and was not taking any antidepressants.  Two weeks after the examination, Plaintiff had stopped seeing the counselor and would not again seek psychological counseling again for

eight months. This was also the last time she sought any mental health treatment. Four months after being examined by Dr. Bergman, Plaintiff was started by her primary care physician, Dr. Nickerson, on an antidepressant and was able to remain on such without any complications caused by her serotonergic syndrome. Thus, the question before the ALJ was what weight to give Dr. Bergman's conclusion that Plaintiff was "a very emotionally fragile woman," Record at 154, when he had conducted a physical, not mental examination, of Plaintiff, had cited a *physical* examination of Plaintiff and her history as a basis for his conclusion, and had seen Plaintiff before she had received any mental health treatment or taken an antidepressant – a medication the lack of which was another part of his basis for his conclusion. The ALJ did not err in not giving Dr. Bergman's conclusion greater weight due to it being issued in the absence of any treatment or medication for Plaintiff's mental health problems and being based on considerations outside his area of expertise and on Plaintiff's subjective report. See **Wildman v. Astrue**, 596 F.3d 959, 967 (8th Cir. 2010) (ALJ did not err in disregarding opinions of consulting psychologists based on their analyses of claimant's physical ailments and on claimant's subjective complaints); **Brosnahan v. Barnhart**, 336 F.3d 671, 676 (8th Cir. 2003) (ALJ did not err in discounting psychologist's opinion about claimant's physical impairments as those impairments were outside his area of expertise).

Similarly, the ALJ did not err in not giving the opinion of Dr. Froman, a consulting psychologist, that Plaintiff would be "significantly and likely severely limited by her fibromyalgia and chronic pain," Record at 159, any weight because it addressed Plaintiff's

physical ailments, impairments outside his area of expertise, and was based on her subjective complaints. See **Wildman**, 596 F.3d at 967; **Brosnahan**, 336 F.3d at 676.

Citing 20 C.F.R. § 416.927(c)(3) (2011),[20] Plaintiff contends that rather than discounting the opinions of Drs. Nickerson, Bergman, and Froman for lack of support the ALJ had a duty to contact each for clarification. Noting that March 2012 amendments to the regulations removed § 416.927(c)(3),[21] the Commissioner counters that there is no error because the evidence before the ALJ was sufficient for him to make a decision.

Similarly to Plaintiff, the claimant in **Grable v. Colvin**, 770 F.3d 1196 (8th Cir. 2014), argued that the ALJ had erred by not seeking clarification from her treating physician about his opinion and by not stating the amount of weight given to it. Noting that "[a]n ALJ is not required to seek 'clarifying statements from a treating physician unless a crucial issue is undeveloped,'" the court found no clarification needed because the ALJ had "considered numerous medical assessments and records in weighing [the physician's] opinion." **Id.** at 1201 (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). "An ALJ need only clarify whether it "discount[ed] [a treating physician's] findings, and, if it did so, why.'" **Id.** at 1202 (quoting McCadney v. Astrue, 519 F.3d 764, 767 (8th Cir.2008)) (alteration in

---

[20]In relevant part, § 416.927(c)(3) read:

If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or, if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence . . . .

[21]See 77 F.R. 10651-01, 10656, 2011 WL 7404303 (Feb. 23, 2012) (providing that § 416.912 will be amended by, among other things, removing paragraph (e)).

original). "The ALJ satisfied that obligation by expressly refusing to give [the physician's] opinion 'great weight' and then explaining its reasons for doing so." **Id.** In the instant case, the ALJ expressly refused to give the opinion of Dr. Nickerson controlling weight and the opinions at issue of Drs. Bergman and Froman any weight and explained his reasons for doing so. There is no error in the ALJ not contacting any of the three for clarification.

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, is within the zone of choice and will not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of January, 2015.